JAMES BELL AND HENRY D. HARRISON, PARTNERS UNDER THE STYLE OF FAULKNER, BELL & CO. *v.* JOHN S. ELLIS, SHERIFF OF THE COUNTY OF SAN FRANCISCO.

GOOD WILL OF TRADE.—The good will of a trade is part of the partnership property, and is an element of strength and permanence which adds much to the value of the partnership property and stock, when decreed to be sold, and will accompany the sale.

IDEM—SOLVENCY OF PARTNERSHIP.—The good will of a trade is the probability that the business will continue in the future as in the past—adding to the profits of the concern, and contributing to the means of meeting its accruing engagements, and is an element to be considered in determining whether, at a given date, the parties conducting the business were solvent.

INSOLVENT TRADER.—A trader is insolvent when he is not in a condition to meet his engagements, or pay his debts in the usual and ordinary course of business; but he is not so merely because his assets, at a given date, may not satisfy all the demands against him, due and to become due.

SALES VOID FOR FRAUD.—A sale of goods on credit is void for fraud, if induced by any false representations on the part of the buyer as to his pecuniary circumstances or ability to pay; but the buyer is not bound to disclose his pecuniary circumstances unless asked to do so; and if he does not, and is not asked to do so,

the mere fact that he is insolvent will not render the sale void, even though he knew himself to be insolvent at the time. Upon this point, *Seligman* v. *Kalkman*, 8 Cal. 207, is overruled.

IDEM.—The fraud in the buyer practiced upon the seller, which will avoid the sale, must be acted, not thought; and it must result in the seller being misled and deceived as to the ability of the buyer to pay, and thereby induced to part with his goods when otherwise he would not; it must act upon the seller, and not exist merely in the mind of the purchaser. If the vendor is allowed to act upon his own judgment, uninfluenced by representations of any kind, no fraud that should avoid a sale is committed. The rule that the bare intent of the buyer, at the time of the purchase, not to pay for the goods, will render the sale void, doubted.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

On the 24th of October, 1863, the plaintiffs sold and delivered to Wegener & Shoenbar fifty bales of tea on ninety days credit. The transaction was in the ordinary course of mercantile business, Wegener & Shoenbar being in excellent credit. Six days afterwards, the house was attached for amounts exceeding the immediately available assets, and these teas seized by the defendant as Sheriff. The plaintiffs then brought this suit in replevin against the Sheriff for the teas, and based their right to a recovery upon the claim that Wegener & Shoenbar were insolvent at the time of the sale; that it was incumbent on them to know and disclose their insolvency, and that the fact of their insolvency and silence upon the subject was a fraud upon the plaintiffs, and vitiated the sale. At the trial the defendant offered to prove, that at the time the goods in question were bought, the good will of the business of Wegener & Shoenbar was worth a large amount of money, to prove how much the same was worth, and that Wegener & Shoenbar could have readily sold it. This proof was objected to by the plaintiffs' counsel as irrelevant, incompetent, and immaterial. The Court sustained the objection, and the defendant excepted to the ruling of the Court.

The Court below sustained this claim, and charged the jury that " where a person or persons, clearly insolvent, shall purchase goods from another on credit, and the fact of

such insolvency is concealed from the seller, the buyer or buyers are guilty of such fraud as vitiates the sale. The question in such case is, whether the purchaser is at the time actually solvent or insolvent." The Court further charged " that the purchaser must be held to know the true state of his own business." And that " the purchaser is held bound to make the facts known to the seller." In pursuance of the same general notions on the part of the Court, the following instructions, asked by defendant, were refused :

" 1. If Wegener & Shoenbar were in good credit at the time of the purchase of the goods in controversy, though insolvent at the time, but were ignorant of the fact, and obtained the goods without practicing any artifice or making any false representations, there is no such fraud as will vitiate the sale.

" 2. If Wegener & Shoenbar knew of their insolvency, and purchased goods without disclosing such insolvency, but without saying anything or doing anything to mislead the plaintiffs, (these sellers,) these facts of themselves did not render the purchase fraudulent.

" 3. To avoid the sale, the plaintiff must prove fraudulent conduct on the part of Wegener & Shoenbar, and to constitute fraud there must be proved an *intention* on the part of Wegener & Shoenbar, entertained at the time of the purchase, not to pay for the goods as agreed.

" 4. If Wegener & Shoenbar were in fact insolvent, but *believed* at the time of the purchase that they were not insolvent, or that they had *reasonable* expectation that they could pay for the goods, at the time of the purchase, their conduct was not fraudulent, and the sale cannot be avoided."

The defendant excepted to the giving of said instructions, and to the refusal of the Court to give the said instructions demanded by him. The plaintiffs had judgment. A motion was made by the defendant for a new trial, which, among

other grounds relied on, presented for review the said exceptions taken by him. The motion was denied by the Court, and the defendant appealed from the order denying said motion and from the judgment.

*John B. Felton,* and *Theodore H. Hittell,* for Appellants, argued that if the rule, as claimed by respondents, and as evidently sanctioned by the Court below, was laid down in *Seligman* v. *Kalkman,* 8 Cal. 207, it is nevertheless against the general current of authority, and bad law; and cited *Nichols* v. *Pinner,* 18 N. Y. 295; *Mitchell* v. *Worden,* 20 Barb. 253; *Hennequin* v. *Naylor,* 24 N. Y. 139; *Brown* v. *Montgomery,* 20 N. Y. 287; *Hall* v. *Naylor,* 6 Duer, 71; *Biggs* v. *Barry,* 2 Curtis, 259; 2 Par. on Con. 730.)

*W. P. C. Whiting,* also for Appellant, argued against the sufficiency of the evidence to sustain the averment of insolvency of Wegener & Shoenbar at the time of making the purchase of respondents. That insolvency is merely an inability to meet payments in the ordinary course of business, as traders usually do, without regard to the surplus of assets over liabilities; and cited 3 Allen, 114; 3 Dowling & Ryland, 218; 1 Maule & Selwyn, 338; 1 Campb. 492; Sug. on Vend. 487–8; Story on Part. Sec. 214; Collyer on Part. Sec. 233.) That the good will of the trade is part of the partnership property, and an essential element to be considered, when the question of the solvency of the firm is presented for solution. (Coll. on Part. 161; 1 Hoff. Ch. 68; 2 Van Sant. Eq. Pr. 201.) Also attacked the rule as laid down in *Seligman* v. *Kalkman;* and cited Broome's Leg. Max. 490; *Atwood* v. *Small,* 1 Cl. & Fin. 232; 1 Story Eq. Jur., 5th ed., Sec. 237; *Duke of Beaufort* v. *Neeld,* 12 Cl. & Fin. 248, 286.)

*Wilson & Crittenden,* for Respondents, argued that upon the evidence no other verdict and judgment than those rendered and entered could be expected on another trial. That the rule of *Seligman* v. *Kalkman,* if upheld, was conclusive of

. the case in favor of respondents. That the rule of that case was fully sustained by authority and well grounded on principle; and cited 2 Par. on Con. 270; *Powell* v. *Bradlee,* 9 Gill. & John. 278; *Biggs* v. *Barry,* 2 Curtis, 262; *Hawse* v. *Crowe,* 21 E. C. L. 784; *Bruce* v. *Ruler,* 17 E. C. L. 700; *Hill* v. *Gray,* 2 E. C. L. 167; *Fitzsimmons* v. *Joslin,* 21 Ver. 129; *Conyers* v. *Ennis,* 2 Mason C. C. 239.)

By the Court, SANDERSON, J.:

Whether we regard the validity of the sale from the plaintiffs to Wegener & Shoenbar as depending solely upon the question whether the latter were insolvent on the 24th of October, 1863, the date of the sale, or upon that fact, accompanied by other circumstances, it seems to us that the defendant ought to have been allowed to prove the value of the good will of the business of Wegener & Shoenbar. While it may be true that the good will of a trade or business will not go far toward the payment of debts when the creditors of the concern take possession, by judicial proceedings, of the stock and effects, and in that way undertake to pay themselves, yet it is equally true that the good will is a very important interest while the trade or business is being carried on in the ordinary course, without interruption from creditors, and is of much account in enabling the concern to meet its engagements. It has been defined " to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances, or necessities, or even from ancient partialities or prejudices." (Story on Part., Sec. 99.) It is often treated as a part of the partnership property. While not a visible, tangible part of the

partnership effects, capable of division in case of voluntary dissolution, it is nevertheless an element of strength and permanency which adds very much to the value of the premises and stock when decreed to be sold and will accompany the sale. According to Lord Eldon it is the probability that the old customers will resort to the old place. It is the probability that the business will continue in the future as in the past, adding to the profits of the concern and contributing to the means of meeting its engagements as they come in. Such being what is meant by the good will of a trade or business, we think it must be taken into account in determining whether at a given date the parties conducting the business are solvent. This will be more apparent if we consider what is meant in this connection, in a legal sense, by the term insolvent.

A trader is insolvent when he is not in a condition to meet his engagements or pay his debts in the usual and ordinary course of business. His solvency or insolvency does not depend upon the simple question whether his assets at the date alleged will or will not satisfy all the demands against him, due and to become due. (*Shone* v. *Lucas*, 3 Dow. & Ryl. 218; *Hazelton* v. *Allen*, 3 Allen, 114; *Bayly* v. *Schofield*, 1 M. & S. 352.) In *Bayly* v. *Schofield* said Mr. Justice Le Blanc: " I take insolvency, as it respects a trader, to mean that he is not in a situation to make his payments as usual, and that it does not follow that he is not insolvent because he may ultimately have a surplus upon the winding up of his affairs;" nor, we add, does it follow that he is insolvent because his stock and effects are insufficient to pay all his liabilities upon a sudden interruption of his business and a winding up of his affairs. The test question is not, " will his effects realize enough to pay his debts due and to become due ?" but " are his affairs in such a condition as to enable him, in the usual and ordinary course of his business, to make his payments as they fall due ?" and the question is to be answered by the jury in view of all the circumstances

79

affecting the business of the trader, including the value of his effects, the extent and character of his business, the manner in which it was being conducted—whether upon a speculative or legitimate and safe basis—the amount of his profits—the extent of his liabilities—whether kept within a safe limit—and generally, his credit, accompanied by the benefit or advantage which he has, outside of the mere value of his property and the debts due him, arising from the good will of the business.

The learned Judge who presided at the trial, in his rulings upon points made while the testimony was being introduced, and in his charge to the jury, followed strictly the case of *Seligman* v. *Kalkman*, 8 Cal. 207. Under the law as there declared the whole case was made to turn upon the single question whether the firm of Wegener & Shoenbar was insolvent on the 24th of October, 1863, the day on which the sale of the tea was made, regardless of the fact whether Wegener & Shoenbar intended to pay for the tea when they bought it, or whether they made, either by themselves in person or through the intervention of other parties, any false representations as to the condition of their affairs, or whether the plaintiffs were at all deceived or misled by any act of Wegener & Shoenbar, or anybody else acting in their interest. In thus putting the case to the jury, we are satisfied that no violence was done to the letter or spirit of *Seligman* v. *Kalkman*; on the contrary, the rule in that case was strictly applied to this.

The rule in *Seligman* v. *Kalkman* is as follows : Every person about to purchase goods from another on credit is bound to know the condition of his own affairs—that is to say, whether he is insolvent or not, and if insolvent he must disclose that fact to the seller without being called upon to do so or the contract of sale, if made, will be null and void, and the title to the goods will not pass. This doctrine is denounced by the learned counsel for the appellant as unsound; and notwithstanding our great desire to follow the lead of our predecessors whenever it can be done with-

out violence to important and well settled principles, we are compelled to so declare it.

We do not consider it profitable to review all the cases which bear more or less directly upon this question. The principal cases are cited in the briefs of counsel. It is sufficient to say that we have not met with a case which in our judgment sustains *Seligman* v. *Kalkman,* nor have the very learned and industrious counsel, who represent the respondents, been able to cite a case which takes the extreme view announced by the learned Justice who delivered the opinion in *Seligman* v. *Kalkman.* It is conceded on all sides that the case which affords to *Seligman* v. *Kalkman* its chief countenance and support is that of *Fitzsimmons* v. *Joslin,* 21 Vt. 130. Mr. Justice Burnett, by whom the opinion in *Seligman* v. *Kalkman* was delivered, seems to have grounded his conclusions mainly upon that case. The case, however, does not in our judgment sustain the extreme doctrine which he seems to have deduced from it. The facts of that case were as follows: Preston, an insolvent merchant of the City of Vergennes, in Vermont, went to the City of New York to purchase a stock of goods. On his way he stopped at Troy, and called upon two firms with whom he had previously dealt, and to whom he was indebted, and told them that he was unable to pay them then, and that he was on his way to New York to buy goods, and then asked them if he did so if they would give him any trouble, adding that if they intended to trouble him he did not wish to make any purchases. They assured him that it was not their intention to trouble him at all; to go on and do the best he could, and that they were willing to take what was coming to them in small sums to suit his convenience. Accordingly Preston went to New York and returned with a stock of dry goods which he had purchased on credit in that city, intending to purchase his groceries at Troy. He called upon the firms already referred to for that purpose, who declined to sell unless he failed to effect a purchase elsewhere, and upon his inquiring for other grocery merchants, gave him the name of the

plaintiff and others.    In the course of the conversation they told him he might refer to them if any questions were asked. Accordingly Preston applied to the plaintiff to sell him a bill of groceries upon credit.    The plaintiff asked for references and Preston named the two firms in question, and was told to call again in the course of an hour.    He did so, and the plaintiff sold him a bill of goods on credit without making any inquiries of Preston as to his ability to pay, and without any assurances or representations from him personally.    But it was shown on the trial that the plaintiff called upon the parties to whom he had been referred by Preston, and that he was told by one of them " that Preston was a clever fellow, and was doing a thriving business in Vergennes, and that he had sold him goods, and he paid well, and he was ready to sell him more," and that Preston was so informed immediately after his purchase.    When Preston reached home with his goods they were immediately attached at the suit of the two Troy firms by whose help Preston had been enabled to purchase.

Such being the facts, the only question debated by counsel and decided by the Court was whether Preston, having made no representations himself, was bound by or was to be considered as a party to the representations made by the parties whom he named when asked for references, and it was very justly held that he was, upon the familiar maxim *qui facit per alium, facit per se.*    The fraud was as barefaced as any which has ever been exposed in a Court of justice.    It was a plain case of robbing another to pay themselves, on the part of the Troy merchants, through the agency of the purchaser, who was fully advised of the deception to be practiced and which was practiced on the seller—a very different case from that presented by the record in *Seligman* v. *Kalkman* or in the present case.    It was little else than the ordinary case of false representations by the purchaser by which the seller is deceived and misled to his prejudice. It was a very plain case of that impression, and it was upon that theory that it was argued and decided.    We find noth-

ing in the opinion, delivered by Mr. Justice Redfield, which gives color, much less explicit sanction, to the doctrine announced in *Seligman* v. *Kalkman*. On the contrary, Mr. Justice Redfield was careful to say: "We do not intend to say that, in a case like the present, the purchaser is bound, whether interrogated or not, to disclose his true circumstances as to property. * * * Within the range of cases of questionable responsibility, no doubt the person seeking credit is justified in obtaining it by mere silence or fair promises, since these are, in some sense, the staple of commercial enterprise and prosperity. But, beyond this, we do not see how any one can be justified, even in the suppression of the truth, much less in the suggestion of falsehood, whether by himself or by others on his behalf." (Page 145.) There is nothing in this language which justifies the inference that every man who is not able to meet all his payments as they may fall due is legally incompetent to acquire the title to goods by purchase on credit, unless he seeks the marts of trade and commerce with the word "insolvent" branded upon his forehead; an inference which seems to have been drawn from it by Mr. Justice Burnett when he wrote the opinion in *Seligman* v. *Kalkman*.

The whole law upon this question is stated by Parsons, in his work on contracts, thus : " There are cases in which the intention seems to constitute the fraud, and to have the force and effect of fraud. For if one buys on credit, and does not pay, still the title of the goods is in him; but if one buys on credit, intending not to pay, this is an actual fraud, and it avoids the sale entirely, so that no property passes to the purchaser. If the question were *res nova*, perhaps it might be doubted whether the rule established by these cases is correct. It is clear that if a purchaser makes false representations of his ability to pay, his property or credit, the sale is void and no title passes as between the original parties to the contract. But it is equally true that the mere insolvency of the purchaser, and his utter inability to pay for goods when purchased, although well known to himself,

will not avoid the sale, if no false representations or means are used to induce the vendor to part with his goods." (2 Parsons on Contracts, 366, marginal paging.)

We agree with Mr. Parsons, that the cases which hold that a bare intent not to pay for the goods renders the sale void are of doubtful logic, for it would seem to be of little consequence what the intent of the purchaser in that respect may be, since he may be made to pay notwithstanding such intent (*Smith* v. *Smith, Murphy & Co.*, 21 Penn. St. R. 370).; but as to the soundness of the remainder of what is said there can be no question on the score of principle or authority. Stripped of such facts as are *sui generis*, the cases are all that way. That such is the law is made clear by an examination of the books; that such should be the law is demonstrated by a moment's reflection.

The rule in *Seligman* v. *Kalkman* grounds the nullity of the contract upon the mere insolvency of the purchaser, thereby converting insolvency into *constructive* fraud ; yet all the cases and all the books agree in placing the nullity of the contract upon *actual* fraud practiced upon the seller, by reason of which he is misled and deceived as to the ability of the purchaser to pay, and thereby induced to part with his goods when otherwise he would not. There is no relation of trust and confidence between buyer and seller—they stand at arm's length ; the rule is *caveat emptor, caveat vendor.* Fraud must be acted, not thought. It must act upon the vendor, and not merely exist in the mind of the vendee. If the vendor is allowed to act upon his own judgment, uninfluenced by representations communicated either by words or acts, no fraud is committed, but a bad sale may have been made, which he must charge to the account of his own fault and folly, in not seeking information from the purchaser or some one else.

Some of the consequences which would follow from an adherence to the rule in *Seligman* v. *Kalkman* are well stated by Mr. Justice Lowrie in *Smith* v. *Smith, Murphy & Co., supra.* He said : " If the fact of buying implies an assertion

of solvency, then any contract by a man in failing circumstances can be made fraudulent, for to this implied assertion a jury might add the inference that he had either investigated his affairs and knew his insolvency, or had not and knew his ignorance; and there might follow, just as logically, the inference not to pay. Thus all the elements of fraud contained in the proposition under consideration may be inferred from the mere fact of a subsequent failure, and the contract is avoided for a constructive fraud, rather than actual fraud. If this were law, it would soon sweep away all the law of contracts, as to persons failing, and a new law of frauds would take its place. On every failure we should have a general scramble among vendors to get back their goods, and suits without number to establish their right by convicting the buyer of fraud. As to the fact of his not revealing his insolvency, some of the above considerations tend to answer it, and it is completely set aside by the principle that no man is under a legal obligation to make known his circumstances when he is buying goods, and no wise dealer would rely upon such representations as a general rule." (Page 371.)

Order denying new trial reversed, and new trial granted.